# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

## NORTHERN DIVISION

| | |
|---|---|
| TRANSPORTATION ALLIANCE BANK, INC., a Utah industrial bank,<br><br>Plaintiff,<br><br>vs.<br><br>BANCINSURE, INC., an Oklahoma stock insurance company,<br><br>Defendants. | MEMORANDUM DECISION AND ORDER<br><br>Case No. 1:11CV148-DAK-EJF |

This matter is before the court on Defendant BancInsure, Incorporated's ("BancInsure") Motion for Summary Judgment. A hearing on the motion was held on December 12, 2013. At the hearing, Plaintiff Transportation Alliance Bank ("TAB") was represented by Matthew L. Lalli and Brock N. Worthen, and Defendant BancInsure was represented by Carleton R. Burch. Before the hearing, the court carefully considered the memoranda and other materials submitted by the parties. Since taking the motion under advisement, the court has further considered the law and facts relating to the motion. Now being fully advised, the court renders the following Memorandum Decision and Order.

## I. BACKGROUND

TAB is an industrial bank principally in the business of factoring–i.e., purchasing accounts receivable from customers at a discount, thus providing the customer with the benefit of immediate cash flow and TAB with a profit when the full receivable is collected or otherwise paid. One of TAB's largest factoring customers, Arrow Trucking, Inc. ("Arrow"), perpetrated a

factoring fraud on TAB during 2008, which resulted in a loss of more than $11.5 million, a loss TAB was unable to recover from Arrow.

In this lawsuit, TAB seeks to recover its factoring fraud loss under a Financial Institution Bond (the "Bond") that TAB purchased from Defendant BancInsure. BancInsure, however, denied coverage of TAB's claim, claiming that the bond does not cover the type of loss suffered by TAB. Accordingly, TAB brought the instant lawsuit against BancInsure, asserting claims for breach of contract, breach of the covenant of good faith and fair dealing, and declaratory relief.

In the instant motion, BancInsure has moved for summary judgment on all TAB's claims, arguing that TAB's claim fails to meet the conditions of coverage under the plain and unambiguous language of Insuring Clause (E) and Insuring Agreement (B).[1] BancInsure also contends that TAB's "bad faith" claim necessarily fails because its breach of contract claim fails.

In response to the motion, TAB argues that the plain language of the Bond requires coverage for TAB's losses resulting from the Arrow fraud. TAB also argues that its interpretation of the Bond is the only reasonable interpretation, but even if the Court accepts BancInsure's interpretation as reasonable as well, the existence of two reasonable interpretations renders the contract ambiguous as a matter of law, and the rules of construction require that it be construed against BancInsure and in favor of TAB.[2]

---

[1] BancInsure also argues that, to the extent TAB has asserted such claims under Insuring Agreement (H) and/or Insuring Agreement (D)(2), no coverage exists under either provision. TAB has clarified through its briefing and at oral argument that it has not asserted claims under these provisions.

[2] Additionally, TAB argues that BancInsure's motion should be denied because BancInsure did not comply with Local Rule DUCivR 56-1(b). *See* Rules of Practice for the United States District Court for the District of Utah. While it is true that BancInsure failed to comply with the local rule, thus complicating the task of TAB in responding to the motion and the court in analyzing the motion, the court declines to deny summary judgment on this basis.

As explained below, the court denies BancInsure's Motion for Summary Judgment. The court agrees with TAB that the language of Insuring Clause (E) is ambiguous, and the rules of construction require that it be construed against BancInsure and in TAB's favor.[3] Additionally, the court concludes that genuine issues of material fact preclude summary judgment on TAB's claim for breach of the implied covenant of good faith and fair dealing. Therefore, this claim must be decided by a jury.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact dispute is "material if it might affect the outcome of the suit under governing law." *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Moreover, a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party on the issue." *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010) (quoting *Anderson*, 477 U.S. at 248) (internal quotation marks omitted).

When considering a motion of summary judgment, the court views "all facts [and evidence] in the light most favorable to the party opposing summary judgment." *S.E.C. v. Smart*, 678 F.3d 850, 856 (10th Cir. 2012) (quoting *Grynberg v. Total S.A.*, 538 F.3d 1336, 1346 (10th

---

[3] Regarding TAB's claim for coverage under Insuring Clause (B), the court agrees with BancInsure that Insuring Clause (B) does not provide coverage for TAB's loss. The court does not address this issue in depth because it appears from TAB's Memorandum In Opposition to Motion for Summary Judgment and also from its oral argument on the motion, that TAB has conceded this claim.

Cir. 2008)). The movant must prove that no genuine issue of material fact exist for trial. *See* Fed. R. Civ. P. 56(a); *Nahno-Lopez,* 625 F.3d at 1283. Accordingly, to survive summary judgment, "the nonmoving party must come forward with specific facts showing there is a genuine issue for trial." *Smart*, 678 F.3d at 858 (quoting *L & M Enters. v. BEI Sensors & Sys. Co.*, 231 F.3d 1284, 1287 (10th Cir. 2000)).

### III.  UNDISPUTED FACTS [4]

TAB first purchased a financial institution Bond from BancInsure in 1999. BancInsure knew that TAB was primarily in the business of factoring and that it sought to obtain factoring fraud coverage.[5] The Bond was issued in three-year increments and renewed thereafter. The

---

[4] Many of the facts underlying this lawsuit are disputed. The great majority of these "disputed" facts, however, are immaterial to the breach of contract claim and instead pertain to TAB's bad faith claim, which therefore must be decided by a jury. The court has not considered the purported factual assertions that are actually legal conclusions or characterizations of the language contained in the A/R Purchase and Security Agreement or in the Bond. Most importantly, for purposes of analyzing the breach of contract claim, the parties do not dispute the language contained in the Bond or the facts and circumstances pertaining to the transactions between Arrow and TAB.

[5] TAB has produced significant evidence reflecting that BancInsure knew that TAB was primarily in the business of factoring and moreover that TAB was specifically purchasing the Bond to obtain factoring fraud coverage. Furthermore, TAB has marshaled evidence that Karl Hammann ("Hammann"), BancInsure's agent, represented that the factoring fraud risks that were a concern to TAB were covered under the policy.

BancInsure asserts in its Reply Memorandum that these facts are disputed and immaterial, but it does not provide any substantive evidence to demonstrate such a dispute. While it is not BancInsure's burden in a Reply Memorandum to produce evidence to create a dispute (indeed, it seeks to demonstrate that there is no genuine issue of material fact), it is puzzling given the posture of the instant case that BancInsure would not set forth any evidence to the contrary, if it had any. In any event, for purposes of the breach of contract claim, the court has considered only the general proposition that BancInsure knew that TAB was primarily in the business of factoring and that TAB's intent was to obtain factoring fraud coverage. The extent of BancInsure's specific knowledge about the nature of TAB's business and the coverage TAB sought will be for

form of the Bond, particularly Insuring Agreements A through F, did not change over the many years that TAB was insured by BancInsure.

On November 10, 2008, TAB and Arrow entered into an Accounts Receivable Purchase and Security Agreement and, on November 25, 2008 entered into the Addendum to the Accounts Receivable Purchase and Security Agreement (together, "A/R Purchase and Security Agreement"). Pursuant to the Accounts Receivable Purchase and Security Agreement, TAB purchased various accounts from Arrow. In simplistic terms, TAB agreed to purchase Arrow's accounts receivable on a rolling basis under the terms provided in the A/R Purchase and Security Agreement. Arrow guaranteed collection of the accounts and secured that obligation with security, which consisted of a large reserve account as well as Arrow's other assets. Pursuant to the A/R Purchase and Security Agreement, Arrow provided electronic account statements to

---

a jury to decide in considering the bad faith claim.

In addition, the court finds no merit to BancInsure's evidentiary objections regarding TAB's evidence on this subject. Specifically, in an Order dated January 31, 2013 (Docket No. 83), the court ruled that Mr. Williams' testimony would not be precluded for purposes of the instant motion or at trial. Thus, BancInsure's objections that (1) Mr. Williams was not properly disclosed, and (2) his testimony is contrary to TAB's designated corporate representative are overruled. BancInsure also conclusorily claims that the evidentiary support is "hearsay" and "not relevant." BancInsure does not contend that Mr. Hammann was not its agent, and thus, his statements are not hearsay under Rule 801(d)(2) of the Federal Rules of Evidence. The court also overrules BancInsure's objection that the evidence is not relevant.

Throughout the briefing of this motion, BancInsure has characterized the nature of the agreement between Arrow and TAB by repeatedly using terms that could more easily preclude coverage under the Bond– terms such as "Credit Line" and the "Arrow Loan Loss." There is no such language in the A/R Purchase and Security Agreement, and, indeed, that document specifically states that it is not a loan. The court will not permit BancInsure to use these misleading terms during the trial of TAB's claim for breach of the covenant of good faith and fair dealing.

TAB on a rolling basis, which evidenced the amount of Arrow's obligation to TAB.

Arrow's fraud consisted of electronically altering the electronic account statements to reflect a higher receivable than actually existed. This, in turn, induced TAB to advance more cash than Arrow was entitled to receive under the multiple agreements, which ultimately led to TAB's loss.

Coverage (E) of the Bond provides, in pertinent part, as follows:

**(E) SECURITIES**

Loss resulting directly from the Insured having, in good faith, for its own account or for the account of others,

    (1)    acquired, sold or delivered, given value, extended credit or assumed liability on the faith of any original

        . . .

        (e)    Evidence of Debt,

        . . .

        (g)    Security Agreement,

        . . . which

        (ii)    is altered . . .

        . . .

Actual physical possession of the items listed in (1)(a) through (I) above by the Insured, its correspondent bank or other authorized representative is a condition precedent to the Insured's having relied on the faith of such items.

The Bond also provides the following relevant definitions:

. . .

(n)   Evidence of Debt means an instrument . . . executed by a customer of the Insured and held by the Insured which in the regular course of business is treated as evidencing the customer's debt to the Insured.

. . .

(x)   Security Agreement means an agreement which creates an interest in personal property or fixtures and which secures payment or performance of an obligation. A number of exclusions are also applicable as follows:

Notably, there are no exclusions in the Bond for factoring fraud or any other loss relevant to the circumstances in this case. The Bond was created from the so-called Form 24 ("Form 24") promulgated by the Fidelity and Surety Association of America ("F&SA"). The Bond is a version of Form 24 that was modified by BancInsure.[6] Unlike Form 24, the Bond does not define "Original" or "Written," nor does the Bond define "Security Agreement" or "Evidence of Debt" as only "Written" agreements. There is no requirement in the Bond, as opposed to Form 24, for Evidences of Debt or Security Agreements to be written on paper. Nor is there any exclusion for electronic Evidences of Debt or Security Agreements.

## IV. DISCUSSION

**A. TAB'S BREACH OF CONTRACT CLAIM**

"Insurance policies are generally interpreted according to rules of contract interpretation." *Utah Farm Bureau Ins. Co. v. Crook*, 980 P.2d 685, 686 (Utah 1999); *Fire Ins.*

---

[6] BancInsure again claims to "dispute" this fact, but it offers no evidence to the contrary. It merely objects to the court's consideration of Form 24, which is attached to TAB's Appendix of Exhibits, on the ground that Form 24 is not properly authenticated. Even if the court does not consider the attached Form 24 (which it does not), BancInsure does not dispute that BancInsure modified Form 24 or that the Bond at issue omits several key definitions that are found in Form 24. These facts are relevant to the court's conclusion that any ambiguous terms must be construed against BancInsure.

7

*Exchange v. Oltmanns*, 285 P.3d 802 (Utah Ct. App. 2012). Courts interpret words in insurance policies according to their usually accepted meanings and in light of the insurance policy as a whole. *Utah Farm Bureau Ins. Co*. 980 P.2d at 686. Policy terms are harmonized with the policy as a whole, and all provisions should be given effect if possible. *Id*. Insurers "may exclude from coverage certain losses by using language which clearly and unmistakably communicates to the insured the specific circumstances under which the expected coverage will not be provided." *Id*. (internal quotations an citations omitted).

In Utah, it is well settled that insurance policies "are to be construed liberally in favor of the insured and their beneficiaries so as to promote and not defeat the purposes of insurance." *Farmers Ins. Exch. v. Versaw*, 99 P.3d 796, 800 (Utah 2004) (internal quotation and citation omitted); *see also Mellor v. Wasatch Crest Mut. Ins. Co*., 201 P.3d 1004, 1009 (Utah 2009) (stating that the Utah Supreme Court interprets insurance policies liberally in favor of the insured "in order to assure that the purpose for which the policy was purchased and the premiums were paid is not defeated."). In other words, ambiguous or uncertain language in an insurance contract that is fairly susceptible to different interpretations should be construed in favor of coverage, and provisions that limit or exclude coverage should be strictly construed against the insurer. *American Nat'l Property & Cas. Co. v. Sorensen,* \_\_\_\_ P.3d \_\_\_, No. 20110221-CA, 2013 WL 6503310 at *4 (Utah Ct. App. Dec. 12, 2013); *United States Fid. & Guar. Co. v. Sandt*, 854 P.2d 519, 521–22 (Utah 1993)); *Fire Ins. Exch. v. Oltmanns*, 285 P.3d 802 (Utah Ct. App. 2012).

An insurance contract "must communicate its terms with sufficient clarity that it can be understood by a reasonable purchaser of insurance." *Mellor*, 201 P.3d at 1008. In Utah, the test for clarity in an insurance contract is as follows:

> [W]ould the meaning be plain to a person of ordinary intelligence and understanding, viewing the matter fairly and reasonably, in accordance with the usual and natural meaning of the words, and in light of existing circumstances, including the purpose of the policy[?]

*Id*. (alterations in original) (internal quotations and citations omitted). "Whether an ambiguity exists in [an insurance] contract is a question of law." *Id*. (internal quotations and citation omitted). Exclusions from coverage can be enforced only if "they use language which clearly and unmistakably communicates to the insured the specific circumstances under which the expected coverage will not be provided." *Oltmanns*, 285 P.3d at 802 (quotations omitted); *see also Mellor*, 201 P.3d at 1008. Utah courts have also made it clear that "the purpose of an insurance policy is one key to its interpretation." *Cyprus Plateau Min. Corp. v. Commonwealth Ins. Co*., 972 F. Supp. 2d 1379, 1385 (D. Utah 1997) (citing *LDS Hosp. v. Capitol Life Ins. Co*., 765 P.2d 857, 859 (Utah 1988)). As a result, insurance policies must be liberally construed "in favor of the insured to accomplish the purposes for which the insurance was taken out and for which the premium was paid." *Farmers Ins*., 99 P.3d at 800.

### 1. Coverage Under Insuring Agreement (E)

As set forth above, Insuring Agreement (E) states, in relevant part,

Loss resulting directly from the Insured having, in good faith, for its own account or for the account of others,

(1) acquired, sold or delivered, given value, extended credit or assumed liability on the faith of any original

. . .

    (e)    Evidence of Debt,

. . .

9

> (g) Security Agreement,
>
> . . . which
>
> (ii) is altered . . .
>
> . . .
>
> Actual physical possession of the items listed in (1)(a) through (I) above by the Insured, its correspondent bank or other authorized representative is a condition precedent to the Insured's having relied on the faith of such items.

BancInsure argues that Insuring Agreement E has five discrete conditions to coverage, all of which must be met before coverage may attach and that TAB's claim does not meet any of these five conditions. TAB, on the other hand, argues that its interpretation of the plain meaning of this language is the only reasonable interpretation, and it compels coverage. Moreover, TAB argues that even if both TAB's interpretation and BancInsure's interpretations are reasonable, then the language is ambiguous and the court must interpret it in favor of coverage. The court agrees with TAB that its interpretation is the only reasonable interpretation, and thus, the loss is covered under the bond. At a minimum, however, the language of the terms discussed below is ambiguous, and the court must interpret it liberally in favor of coverage to accomplish the purposes for which the insurance was taken out and for which the premium was paid.

### a. *Evidence of Debt and Security Agreement*

First, BancInsure argues that neither the "invoices" nor the summaries thereof is among the categories of documents listed in Insuring Clause (E).[7] The court disagrees. Under the plain

---

[7] Both BancInsure and TAB have referred to the fraudulent scheme perpetrated by Arrow as a "fraudulent invoice scheme." TAB has pointed out that the use of the term "invoice" has become an imprecise, shorthand term used to describe the electronic data that was transmitted from Arrow to TAB under the A/R Purchase and Security Agreement, which contained the fraudulent alterations. Because the alterations occurred electronically, the alterations were to

and ordinary meaning of the term, the combination of the A/R Purchase and Security Agreement and the electronic account statements that Arrow provided to TAB satisfy the "Evidence of Debt" definition in the Bond. That definition provides that "Evidence of Debt means an instrument, including a Negotiable Instrument, executed by a customer of the Insured and held by the Insured which in the regular course of business is treated as evidencing the customer's debt to the Insured."

The electronic account statements qualify as "instruments" for the same reasons they qualify as originals, as discussed below. They were executed in the only way electronic data can be executed—electronic transmission at the command of the sender, Arrow, which was a customer of TAB, the Insured. TAB treated the electronic account statements, and in particular the fraudulently altered amounts, as evidencing Arrow's debt to TAB. Under the terms of the A/R Purchase and Security Agreement, Arrow was obligated to pay TAB the full amount shown on the statement in exchange for TAB's immediate advance of a discounted amount. Arrow bore the risk of collection and secured that risk by its reserve account.

Thus, if the fraudulently altered account statement said the receivable was $21,000, Arrow was responsible for making sure TAB received that amount, either through collection of the receivable, the reserve account, or the guarantee. The account statements provided under the A/R Purchase and Security Agreement meet the definition of Evidence of Debt. *See, e.g., Valley Community Bank v. Progressive Cas. Ins. Co.*, 854 F. Supp. 2d 697, 704 (N.D. Cal. 2012)

---

electronically stored data which is capable of being presented in a variety of formats. Because the shorthand term "invoice" does not fully capture the electronic transmission that actually occurred, and may even be unintentionally misleading, TAB refers to the electronic transmissions and alterations as electronic account statements or account statements.

(holding that related documents, "[w]hen read together," could constitute a security agreement and citing cases supporting this position); *Metro Fed. Credit Union v. Fed. Ins. Co.*, 607 F. Supp. 2d 870, 874-75 (N.D. Ill. 2009) (construing accounts receivable financing agreement, advance requests, and invoices as a single document for determining coverage under bond); *Omnisource Corp. v. CNA/Transcontinental Ins. Co.*, 949 F. Supp. 2d 681, 688 (N.D. Ind. 1996) (finding sight draft and supporting documents to be "single instrument" because the former was useless without the latter).

Similarly, BancInsure's second assertion that the electronic account statements were not signed misconstrues the requirement. As quoted above, the Evidence of Debt definition requires that the instrument be "executed," not that it be signed. "Execution" is a broader concept than "signed." "As Black's Law Dictionary indicates, there is more than one meaning for the term 'execute.'" *ALSA Assocs. v. City of New Haven*, 873 A.2d 1025, 1028 (Conn. Ct. App. 2005). "Executed is defined as, '([of] a document) that has been signed,' or '[t]hat has been done, given, or performed.' Black's Law Dictionary, 609 (8th Ed.1999)." *Baltimore Cnty., Maryland v. Aecom Servs., Inc.*, 28 A.3d 11, 24 n.7 (Md. Ct. App. 2011). Again, an electronic transmission is executed or done or performed when the sender transmits or "gives" the electronic document by hitting the send button and directing it to the intended recipient.

Moreover, the electronic account statements, issued serially under the terms of the A/R Purchase and Security Agreement, satisfy the definition of "Security Agreement" just as they satisfy the definition of "Evidence of Debt." Under the Bond, "Security Agreement means an agreement which creates an interest in personal property or fixtures and which secures payment or performance of an obligation." As explained above, Arrow's debt to TAB was repayment of

the full amount of the stated receivable either by collection, application of the reserve, or otherwise. The chief security for Arrow's repayment obligation was the reserve account, as set forth in the A/R Purchase and Security Agreement, but the Security Agreement also included Arrow's various other assets. Therefore, the A/R Purchase and Security Agreement created an interest for TAB in that reserve account, which secured Arrow's payment or performance of an obligation. This satisfies the definition of Security Agreement.

Accordingly, the court finds that the electronic account statements and the A/R Purchase and Security Agreement, considered together, satisfy the plain meaning of the terms "Evidence of Debt" and "Security Agreement."

### b. *Originals*

As stated above, the documents that satisfy the requirements of Coverage (E) were the combination of the A/R Purchase and Security Agreement and the electronic account statements that Arrow provided to TAB. BancInsure does not dispute TAB's possession of an original of the A/R Purchase and Security Agreement. But BancInsure argues that the "original" requirement is not satisfied with respect to the account statements Arrow serially submitted to TAB under the authority of the A/R Purchase and Security Agreement because the statements are submitted electronically and not in hard copy. More specifically, BancInsure argues that the electronic statements are the equivalent of photocopies, which some other courts have determined are not originals.

Nothing in the Bond states that electronically transmitted information cannot satisfy the "original" requirement. The term "original" is not defined in the Bond. Accordingly, the term should be assigned its ordinary meaning. *See Ohio Cas. Ins. Co. v. Unigard Ins. Co.*, 268 P.3d

180, 184 (Utah 2012) (When interpreting policy terms, Utah courts "afford [] the policy terms their usually accepted meanings and giv[e] effect to and harmoniz[e] to the extent possible all policy provisions"). Dictionaries define "original" as "not secondary, derivative, or imitative," or "being the first instance or source from which a copy, reproduction, or translation can be made." See "Original." Merriam-Webster.com. Merriam-Webster, Web. [http://www.merriam-webster.com/](http://www.merriam-webster.com/)dictionary/original (last accessed February 20, 2014). The ordinary meaning of the term "original" includes electronic originals—particularly in today's banking world where most people do most or all of their banking online, and electronic copies are widely considered originals.

Second, defining "original" to mean a printed hard copy is contrary to the context and origin of the Bond itself. The Bond does not define the term "original," and that omission is significant. This is because the Bond was based on a banking industry form called Form 24, which is promulgated by the F&SA. Form 24, unlike the Bond in this case, does define the term "Original" (with a capital O) in section 1(q) of the Conditions and Limitations of F&SA: "Original means the first rendering or archetype and does not include photocopies or electronic transmissions even if received and printed." Had BancInsure included this definition of "Original" in the Bond, the electronic account statements that TAB received would not be considered "originals." The omission of the F&SA Form 24 definition of "original" in this Bond, which would have excluded electronic documents if applied, must be assumed to be deliberate. The Form 24 defined term and requirement that the documents be "Written" also was omitted from the Bond.

Third, courts have recognized that electronic documents cannot be distinguished from

hard copies. In *Aventa Learning, Inc. v. K12, Inc.*, 830 F. Supp. 2d 1083, 1105 (W.D. Wash. 2011), the court reasoned as follows:

> the court can find no logical basis for distinguishing between theft of copy and theft of the original electronic document. After all, the copy of the original (although allegedly created by Plaintiffs) would belong to Defendants as well. Courts dealing with this issue have begun to update the tort of conversion so that it keeps pace with the contemporary realities of widespread computer use.

*See also E.I. DuPont de Nemours and Co. v. Kolon Indus., Inc.*, 688 F. Supp. 2d 443, 455 (E.D. Va. 2009) ("[Plaintiff's] claim for conversion, even if based exclusively on the transfer of copies of electronic information, survives [defendant's] motion to dismiss."); *Thyroff v. Nationwide Mut. Ins. Co.*, 864 N.E.2d 1272, 1278 (2007) ("[T]he tort of conversion must keep pace with the contemporary realities of widespread computer use," and therefore, "electronic records that [are] stored on a computer . . . [are] subject to a claim of conversion.").

Fourth, the electronic account statements should be deemed originals based on Utah's Uniform Electronic Transactions Act ("UETA"), which applies to "transactions between parties each of which has agreed to conduct transactions by electronic means," with the parties' intent to be determined by "the context and surrounding circumstances." Utah Code Ann. § 46-4-105(2)(A). Arrow and TAB intended to transact through electronic means when Arrow gave TAB access to its computer system. UETA therefore provides that "[a] record . . . may not be denied legal effect or enforceability solely because it is in electronic form." Utah Code Ann. § 46-4-201(1). UETA also authoritatively states that an electronic document is equivalent to an original document for retention and presentation purposes. *Id*. at § 46-4-301(4). Not only does UETA demonstrate that the banking world widely recognizes the reality and enforceability of electronic transmissions, but in the last decade several other federal acts have

15

granted legal validity to electronic documents.

Furthermore, case law exists throughout various jurisdictions to suggest electronic documents should be recognized. *See People v. McFarlan*, 191 Misc.2d 531, 536-37 (S. Ct. N.Y. 2002) (holding that a second printout of a digitally stored picture met the original record standard and noting that "to decide that . . only a manifestation in human readable form could be an original record, is absurd"); *Presbyterian Med. Ctr. of Oakmont v. Dep't of Pub. Welfare*, 792 A.2d 23, 26 (Pa. Commw. Ct. 2002) (briefly noting the fact that invoices submitted to the Department for reimbursement were "original electronic invoices," but affirming the denial of reimbursement claim for late submission); *Menke v. Broward Cnty. Sch. Bd*., 916 So. 2d 8, 10 (Fla. Dist. Ct. App. 2005) (noting how we now have computers store bytes of information in an "electronic filing cabinet," instead of having filing cabinets filled with paper documents). These nationwide trends suggest that should any ambiguity arise about whether an electronic document is equivalent to an original or not, the court should uphold the electronic document.

The court finds that, in the absence of a definition to the contrary, electronic transmissions are a way of life and are just as original as a printed, hard copy document that contains the same information. Indeed, by omitting Form 24 defined terms like "Original" and "Written," BancInsure allowed for coverage based on electronic information, alterations, and transmissions. The electronic account statements Arrow fraudulently altered and then transmitted to TAB under the terms of the A/R Purchase and Security Agreement (itself a hard copy document) are reasonably considered to be originals for purposes of determining coverage under the Bond.

c. *Altered*

While the term "alter" is not defined by the Bond, the electronic change that Arrow made reasonably constitutes an alteration under the ordinary meaning of the term. Arrow fraudulently altered the account statements it then sent to TAB, which in turn induced TAB to over-advance millions of dollars to Arrow. The alteration occurred by simple key strokes in which Arrow overwrote the correct account receivable data with false data, which it sent to TAB. Indeed, electronically altering an amount such as $1,000 by placing a 2 in front of the 1 to make it $21,000 is no different substantively from taking a pen and writing in a 2 on a hard copy document. *See, e.g., Metro Fed. Credit Union v. Fed. Ins. Co.*, 607 F. Supp. 2d 870, 881 (N. D. Ill. 2009). The alterations occurred in the only way an electronic alteration could occur – by using key strokes to overwrite or change the account data.

d. **Actual Physical Possession**

The court finds that TAB had actual physical possession of both the Evidence of Debt and the Security Agreement in the form of electronic data. There is no difference between possessing a hard copy of an Evidence of Debt or Security Agreement and possessing the same data in its original electronic form on a secure server, to be viewed on a computer screen, and which was transmitted electronically instead of through the mail.

e. **Resulting Directly From**

TAB's loss from Arrow's factoring fraud was the amount it over-advanced to Arrow based on the fraudulent alteration of the amount of the various accounts receivable. TAB's loss resulted directly from TAB's having made the over-advances. TAB made the over-advances because and only because Arrow fraudulently altered its accounts receivable. If Arrow had not

17

made the alterations, TAB would not have over-advanced and would not have suffered the losses. This interpretation and explanation of the phrase "resulting directly from" is reasonable and follows from the ordinary meaning of the words, as the phrase is not a defined term in the Bond.

While not disputing that TAB lost millions because Arrow fraudulently altered its account statements, BancInsure argues that such losses were not the result of the fraudulent alteration, but "from the fact that invoices contained false representations of fact." This is a distinction without a difference. The court finds that if Arrow had not altered the documents, TAB would not have suffered the factoring fraud loss. As a result, TAB's "loss resulted directly from" Arrow's alterations.

### B. TAB'S CLAIM FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

In Utah, first-party bad faith insurance claims are claims for breach of the implied covenant of good faith and dealing. *See, e.g., Colony Ins. Co. v. Human Ensemble, LLC*, 299 P.3d 1149, 1150 (Utah Ct. App. 2013). "[T]his implied covenant imposes a duty 'not to intentionally or purposely do anything [that] will destroy or injure the other party's right to receive the fruits of the contract and to . . . act consistently with the agreed upon common purpose and the justified expectations of the other party." *Id*. at 1153. Further, the implied covenant "requires the insurer . . . to refrain from actions that will injure the insured's ability to obtain the benefits of the contract. *Id*. (quoting *Beck v. Farmers Ins. Exch*., 701 P.2d 795, 801 (Utah 1985)). The *Colony Insurance* court concluded: "[b]y requiring that the insurer act reasonably and in good faith in resolving the insured's claims, these implied duties protect an

insured's expectation that he will receive the benefits he reasonably anticipated when he obtained the insurance policy."

There are many genuine issues of material fact regarding TAB's claim that BancInsure breached the covenant of good faith and fair dealing. For example, there are disputed facts concerning whether BancInsure's agent(s) made specific representations about whether the type of fraud at issue in this case would be covered and whether BancInsure knew the specific purpose of the Bond. If so, a jury must decide whether BancInsure's coverage interpretation of the Bond destroyed the purpose of the Bond. Additionally, genuine issues of material fact exist as to whether BancInsure failed to diligently investigate and fairly evaluate TAB's claim. Accordingly, TAB's claim for breach of the covenant of good faith and fair dealing must be decided by a jury.

## CONCLUSION

Accordingly, IT IS HEREBY ORDERED that Defendant's Motion for Summary Judgment [Docket No. 47] is DENIED. The court has construed to Bond at issue to provide coverage to TAB for the loss it suffered due to Arrow's fraud. There are genuine issues of material fact that preclude the court from ruling on TAB's claim for breach of the covenant of good faith and fair dealing, and thus, that claim must be decided by a jury. In the near future, the court will set a date for a scheduling conference to set a trial date and other relevant deadlines.

DATED this 21st day of February, 2014.

BY THE COURT:

_____
DALE A. KIMBALL
United States District Court Judge